IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STANLEY LERNER,

    *Plaintiff*,

    v.

ERIC K. SHINSEKI,
Secretary of the United States
Department of Veterans Affairs,

    *Defendant*.

Civil Action No. ELH-10-1109

## MEMORANDUM OPINION

Stanley Lerner, plaintiff, filed suit against Eric K. Shinseki, defendant, in his capacity as

Secretary of the United States Department of Veterans Affairs (the "Department" or the "VA"),

arising from Lerner's termination from employment with the Department in June 2009. *Id.* ¶ 12.

In particular, plaintiff alleges discrimination on the basis of age, in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Count I);

discrimination on the basis of disability, in violation of Section 501 of the Rehabilitation Act of

1973, 29 U.S.C. § 791 (Count II); and the tort of intentional infliction of emotional distress

("IIED") (Count III). *See* Complaint ¶¶ 5, 13-23 (ECF 1).[1]

Defendant has filed a Motion To Dismiss And For Summary Judgment (ECF 12). He

urges dismissal of plaintiff's Rehabilitation Act and IIED claims, and seeks summary judgment

---

[1] As to Counts I and II, the Court has subject matter jurisdiction based on 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f)(3) (federal civil rights). Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over plaintiff's Maryland state law tort claim (Count III).

as to plaintiff's ADEA claim. Alternatively, defendant contends that, if plaintiff's Rehabilitation Act claim is not dismissed, defendant is entitled to summary judgment.

The motion has been fully briefed, and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the Court will grant defendant's motion for summary judgment as to Counts I and II, and will dismiss Count III.

## Background[2]

In September 2008, the Department enrolled the inaugural class of interns in its Veterans Affairs Acquisition Academy Internship School ("Internship School"). Complaint ¶ 6. Located in Frederick, Maryland, the Internship School was conceived as a three-year program designed to "prepar[e] the interns to become certified acquisition professionals." *Id.* The program consists of two years of classroom training and supervised work experience, followed by a one-year "residency" at one of the VA's facilities throughout the country. *See* Career Intern Contract Specialist Vacancy Announcement/Position Description at 2 (ECF 17-3), Ex.2 to Mem. of Points & Authorities in Opp. to Mot. to Dismiss and for Summ. J. ("Opp.") (ECF 17-1). Despite the program's academic trappings, the "interns" enrolled in the school are hired as paid employees of the VA, in the position of "Contract Specialist." *Id.* at 1.

Lerner was a member of the Internship School's inaugural class of approximately thirty interns. Complaint ¶ 6. At the time he was hired, plaintiff was 76 years of age. Opp. at 2.

---

[2] Defendant argues that the Court should dismiss certain of plaintiff's claims for want of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), dismiss others for failure to state a claim under Rule 12(b)(6), and grant summary judgment under Rule 56 as to others. The Court must apply a different standard of review in each context, with different implications for what facts outside of the Complaint, if any, can be considered. Although some of the facts set forth in this "background" section are drawn from exhibits submitted with the parties' motion papers, the facts in this section are not contested for purposes of defendant's motion, unless otherwise noted. Additional facts are set forth in the discussion regarding each claim.

The Internship School was the first of three schools established within the VA's Acquisition Academy, whose mission is to "provide educational opportunities to VA employees throughout their careers." Declaration of Lisa Doyle ¶ 2 ("Doyle Decl.") (ECF 12-3), Ex.1 to Mem. of Law in Support of Mot. to Dismiss and for Summ. J. ("Mem.") (ECF 12-1). Lisa K. Doyle became the chancellor of the Internship School in July 2008. *Id.* From September 2008 until November 2008, she supervised the Internship School's inaugural class of interns. *Id.* ¶ 7. On November 24, 2008, Melissa Starinsky was installed as vice-chancellor of the Internship School. At that time, she became the supervisor of the intern class, reporting to Doyle. *Id.* However, Doyle was responsible for all termination decisions through June 12, 2009. *Id.* ¶ 8.

According to the Complaint, soon after plaintiff began employment at the Internship School, he "became the subject of jeering, taunting, snikering [sic], and disparaging comments from some of his fellow acquisition interns, because of his age." Complaint ¶ 9. Other interns made comments such as, "what is the old man doing here?" *Id.* Plaintiff alleges that these comments were made in the presence of instructors, including Doyle and Starinsky, who did not "take any corrective measure" to stop the "jeering" behavior of plaintiff's fellow interns. *Id.*

Plaintiff also alleges that Doyle made comments to him reflecting her own "bias and prejudice against Mr. Lerner[] because of his age." Opp. at 13. Specifically, plaintiff claims that, "[a]fter an incident where Mr. Lerner was counseled by Ms. Doyle about alleged performance issues, Mr. Lerner asked Doyle about what changes Mr. Lerner could make to improve or correct the issues. Ms. Doyle responded to Mr. Lerner that, 'you are too old to change.'" Complaint ¶ 10. On another occasion, according to plaintiff, "Ms. Doyle made a remark to Mr. Lerner that, 'it was a mistake' for Mr. Lerner to have been accepted" into the

Internship School.  *Id.*[3]

Further, plaintiff avers in his Complaint that he suffers from chronic obstructive pulmonary disease ("COPD").  Complaint ¶ 11.  He asserts that, "[s]ometime in May 2009," Starinsky approached him to discuss her observation that he "appeared drowsy or lethargic in class."  *Id.*  At that time, Lerner allegedly informed Starinsky that he suffers from COPD, and that "drowsiness and lethargy were symptoms of his illness, and[/]or side effects of his medication."  *Id.*  According to plaintiff, he told Starinsky that he would "follow up with his doctor" to "ensure minimal disruption or interferance [sic] to Mr. Lerner's work resulting from Mr. Lerner's diagnosis and treatment."  *Id.*[4]

On March 9, 2009, Robert Cagle, Director of the VA's Security and Investigations Center, sent a "Letter of Warning" to plaintiff, granting him "final eligibility to occupy a position that has been designated at the Moderate Risk Level."  Letter of Warning, Ex.9 to Opp. (ECF 17-10).  Cagle cautioned Lerner that he was deemed eligible "despite . . . derogatory information in [Lerner's] Background Investigation."  Specifically, Cagle wrote:

---

[3] The Complaint does not state the date of either occurrence.  In his administrative "Complaint of Employment Discrimination" ("VA Complaint"), filed with the VA on July 24, 2009, Ex.20 to Opp. (ECF 17-21), plaintiff stated that Doyle made the comment that it was a "mistake" to hire him "[e]arly during [his] employment."

Also in the VA Complaint, plaintiff stated that, at a meeting in March 2009, the comment was made that he was "too old to change."  However, in the VA Complaint, plaintiff stated that it was Starinsky—not Doyle—who made the comment.  Defendant points out this discrepancy in his Memorandum, *see* Mem. at 18, but plaintiff has not explained it.  In any event, both Doyle and Starinsky deny making such comments.  *See* Starinsky Aff. ¶¶ 19-20, Ex.10 to Opp. (ECF 17-11); Doyle Aff. ¶¶ 19-20, Ex.12 to Opp. (ECF 17-13).

[4] Again, Starinsky disputes Lerner's account of this conversation.  She maintains that she was "unaware of any disability" and that "Mr. Lerner never made me aware of any disability."  Starinsky Aff. ¶ 5.  *See also* Declaration of Melissa Starinsky ¶ 13 ("Starinsky Decl."), Ex.2 to Mem. (ECF 12-7).

[Y]ou were the subject of a Financial Institution Fraud investigation in 1998 and subsequently involved in a massive mortgage fraud scheme in 1999 which led to your signing a cooperation agreement and pleading guilty to the charges of False Statements on a Bank Application, Conspiracy, and Money Laundering. You also have at least three personal financial accounts that are either seriously past due or already in collection status.

Further, the letter warned: "Any future occurrences of this conduct could result in the temporary or final revocation of your eligibility." Nevertheless, Cagle indicated that the letter was "not intended as an adverse action." Plaintiff countersigned the letter on March 25, 2009, to acknowledge that he received it.

On March 16, 2009, Starinsky sent Lerner a "Letter of Counseling." Ex.11 to Opp. (ECF 17-12). It identified several "concerns" regarding Lerner's "inappropriate behavior in the classroom and . . . performance in the intern program," and stated that Lerner's "behavior is unacceptable and performance improvement is required." *Id.* at 1. First, Starinksy cited reports from "several people" that on March 9, 2009, Lerner had made "angry, aggressive, and annoying comments directed at the instructor." *Id.* She commented: "This is an emerging pattern that I have addressed personally when I have observed it and has been communicated to me by your peers on multiple occasions." *Id.* Second, Starinsky cited an allegation, about which she had previously counseled plaintiff (and which she acknowledged plaintiff denied), that plaintiff had "paid a friend to do a work assignment" and then sought "to apply for overtime to offset the payment" to the friend. *Id.* Starinsky also noted several examples of plaintiff's failure to "follow instructions" and his display of poor "written communication skills" in his assignments. *Id.* Finally, Starinsky noted that she had "previously counseled [Lerner] about [his] . . . sleeping in the classroom," and said: "I have offered VA's Employee Assistance program to help you in the event there are reasons of a personal nature that are affecting you." *Id.*

Plaintiff claims that, after receiving Starinsky's Letter of Counseling, he "continued to perform his duties satisfactorily as a contract specialist." Opp. at 4. However, on June 12, 2009, plaintiff was called to a meeting with Starinsky and Doyle, at which Doyle presented him with a letter terminating Lerner's employment, effective June 26, 2009. *See* Termination Letter, Ex.13 to Opp. (ECF 17-14). The letter explained that Lerner was "being terminated from [his] position with the [VA] for [his] failure to maintain minimal performance standards." *Id.* at 1. Citing Starinsky's previous Letter of Counseling, Doyle wrote, *id.* at 1:

> Among other things, Mrs. Starinsky expressed concerns about you repeatedly falling asleep during class and your inability to follow instructions. Mrs. Starinsky offered you the assistance or [sic] the VA's Employee Assistance Program at that time in the event there were any reasons of a personal nature that were causing you difficulty in remaining awake during class. You informed her at that time that there were no reasons of a personal nature that were preventing you from staying awake during class.

Further, Doyle cited an incident on May 4, 2009, when "the VA Acquisition Academy had two distinguished guests visit the interns." *Id.* According to the letter, plaintiff "arrived for the session 10 minutes late and proceeded to fall asleep in front of our distinguished guests." *Id.* Doyle wrote: "Your sleeping in class is a recurring pattern that has not been resolved despite our previous counseling sessions with you." *Id.*

Finally, Doyle quoted an assessment from a "formal FMG-FAC-C training" that Lerner had received,[5] which evaluated Lerner in the "assessment areas" of analysis, thinking, and

---

[5] "FMG" stands for Federal Market Group, a private firm that provided course instruction in the Internship School. *See* Starinsky Decl. ¶ 4. According to a memorandum authored by Efrain J. Fernandez, discussed in more detail, *infra*, "FAC-C stands for Federal Acquisition Certification for Contracting and is the officially recognized certification for acquisition professionals." Ex.19 to Opp. (ECF 17-20).

Plaintiff asserts that, although the "FMG-FAC-C" assessment mentioned in Doyle's termination letter was dated for the period from September 15, 2008, through March 15, 2008,

contribution.  Lerner was rated "unacceptable" with respect to analysis and thinking, and "acceptable" as to contribution.  But, Lerner did not receive the highest rating, "mastery," in that area.  *See* FMG FAC-C Student Assessment Rubric ("FMG Assessment"), at 1-2, Ex.3P to Mem. (ECF 12-26).

With regard to "analysis," the FMG Assessment stated, *id.* at 1:

Intern does not appear to be able to discern the functional complexities of the contracting body of knowledge and fails to demonstrate good leadership and communication skills consistently.  He does not appear to be able to integrate facts and identify the implications.  Often his questions or statements evidence a lack of understanding of basic facts.  He is not looked to by other students to explain complexities or to integrate the facts.

As to "thinking," the FMG Assessment opined: "Intern appears to lack the ability to diverge from established views.  He does not support conclusions with evidence.  His conclusions do not follow logically from the evidence provided.  He does not foster creative or analytical thinking.  He appears to be unable to see the big picture." *Id.* at 2.

With respect to "contribution," Lerner received an "acceptable" rating "primarily because he is perceived to genuinely want to make a contribution and he does reasonably well in the exams." *Id.*  Although the assessment recognized that Lerner "is personable and appears to want to contribute" and "is respectful of an open to views of others," *id.,* it related that Lerner's "failure to comprehend the facts and see the big picture hinders his contributions." *Id.*

In sum, the assessment concluded: "Given [Lerner's] current demonstrated knowledge and skills, we have concerns about his ability to function as a contracting officer." *Id.* at 1.

Lerner never received a copy of the assessment until the meeting with Doyle and Starinsky on June 12, 2009, at which he was fired.  Opp. at 5.  This is consistent with Starinsky's statements that she "did not begin to receive individual student reviews from FMG . . . until June of 2009," Starinsky Decl. ¶ 7, and that she "received the FMG assessment of Mr. Lerner's classroom performance" in "early June 2009." *Id.* ¶ 15.

Lerner contested his termination by way of informal counseling through the VA's Office of Resolution Management, by filing an informal complaint on June 19, 2009. *See* EEO Counselor's Report, Ex.3A to Mem. (ECF 12-11). Counseling was inconclusive and, on July 17, 2009, Lerner was notified of his right to file a formal complaint. On July 24, 2009, Lerner filed an administrative complaint of employment discrimination with the VA's Office of Resolution Management, contending that he was terminated because of his age, his medical condition of COPD, and his religion.[6] *See* VA Complaint. *See id.* at 2. Lerner's claims were investigated by EEO Investigator Richard Munsky, with the Office of Resolution Management. Munsky completed his investigative report on December 9, 2009. *See* Investigative Report, Ex.21 to Opp. (ECF 17-22). Lerner submitted a Request for Final Agency Decision on January 12, 2010. However, if a final agency decision was reached, neither party has provided a copy of it to the Court. Lerner filed suit in this Court on May 3, 2010.[7] *See* Complaint.

Additional facts will be included in the discussion.

## Discussion

### A. Statutory and Regulatory Background

As noted, plaintiff has brought suit under the Rehabilitation Act and the ADEA, which prohibit employment discrimination by federal agencies on the basis of disability and age of 40 or older, respectively. *See* 29 U.S.C. § 791(g) (applying substantive standards of Title I of the

---

[6] Lerner, who is Jewish, claimed that Starinsky discriminated against him on the basis of his faith. He has not raised a claim of religious discrimination in this Court, however.

[7] Under the applicable regulations, an agency "shall issue the final decision within 60 days of receiving notification that a complainant has requested an immediate decision from the agency." 29 C.F.R. § 1614.110(b). However, a complainant may file a civil action "[a]fter 180 days from the date of filing an individual or class complaint if an appeal has not been filed and final action has not been taken." *Id.* § 1614.407(b). Defendant has raised no dispute as to plaintiff's compliance with these provisions.

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 *et seq.*, to Rehabilitation Act claims of employment discrimination on the basis of disability in federal employment); 29 U.S.C. § 633a (section of the ADEA prohibiting discrimination on the basis of age in "personnel actions" of federal agencies that affect "employees or applicants for employment who are at least 40 years of age").

The statutes in issue authorize a federal employee who alleges discrimination on the basis of disability or age to file a civil action. *See Laber v. Harvey*, 438 F.3d 404, 415-16 (4th Cir. 2006). However, before filing suit, a federal employee must first exhaust administrative remedies. *See, e.g.*, *id.* at 415; *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 462 (D. Md. 2002). The administrative remedy procedure that applies to both the Rehabilitation Act and the ADEA (as well as other federal laws prohibiting employment discrimination, including Title VII of the Civil Rights Act of 1964), is set forth in 29 C.F.R. part 1614. *See* 29 C.F.R. § 1614.103(a) ("Individual and class complaints of employment discrimination and retaliation prohibited by . . . the ADEA . . . [or] the Rehabilitation Act . . . shall be processed in accordance with this part.").[8]

In *Figueroa v. Geithner*, 711 F. Supp. 2d 562 (D. Md. 2010), involving a suit filed by an employee of the Internal Revenue Service under the Rehabilitation Act, Judge J. Frederick Motz recently summarized the administrative procedure. He explained, *id.* at 569-70:

> As a prerequisite to [a Rehabilitation Act] suit, a federal employee must seek administrative review of his claim and comply with various administrative procedures.[ ] *See Young v. Nat'l Ctr. for Health Serv. Research*, 828 F.2d 235, 237 (4th Cir. 1987) (analyzing Title VII claim); *Zografov v. VA Med. Ctr.*, 779 F.2d 967, 968-69 (4th Cir. 1985) (same); *see generally Laber v. Harvey*, 438 F.3d 404, 416-24 (4th Cir. 2006) (same). "As a first step," the employee must seek consultation, regarding the adverse employment action, with an EEO counselor

---

[8] The administrative remedy in 29 C.F.R. part 1614 does not apply to all federal employees. *See* 24 C.F.R. § 1614.103(b)-(d). However, it is undisputed that it applies to Lerner.

within forty-five days of the "effective date" of the alleged discrimination. *See* 29 C.F.R. § 1614.105(a)(1); *Young*, 828 F.2d at 237 (interpreting an older version of § 1614.105(a) (§ 1614.214(a)(1)(i)) in a Title VII claim). However, the forty-five-day time limit shall be extended "when the individual shows . . . that he or she did not know and reasonably should not have been [sic] known that the discriminatory matter or personnel action occurred. . . ." See 29 C.F.R. § 1614.105(a)(1)-(2).

In addition to EEO counseling, a federal employee must file a timely administrative complaint with the employer-agency—and the agency generally must take final action on that complaint—challenging the adverse employment action. *See* 29 C.F.R. 1614.106(a); *Young*, 828 F.2d at 237 (citing an older version of § 1614.106 (§ 1613.214(a)(1)(ii))). Although the scope of the subsequent civil suit is constrained by the allegations in the administrative complaint, "[a]n administrative charge of discrimination does not strictly limit [the civil suit]; rather the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the [administrative] charge of discrimination." *Lane v. Wal-Mart Stores East, Inc.*, 69 F. Supp. 2d 749, 755-56 (D. Md. 1999) (quoting *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)); *Chisholm*, 665 F.2d at 491 (in a Title VII action, where administrative complaint had only challenged promotion and detailing, holding that plaintiff could bring claims of discrimination in discipline and testing because "allegation . . . that USPS discriminated in promotions sufficed to put USPS on notice that the entire promotion system was being challenged, including . . . discipline and testing" (internal citations omitted)); *cf.* § 1614.106(c) ("A complaint must contain a signed statement from the person claiming to be aggrieved or that person's attorney. This statement must be sufficiently precise to identify the aggrieved individual and the agency and to describe generally the action(s) or practice(s) that form the basis of the complaint."); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-48 (4th Cir. 2000) ("If a plaintiff's claims . . . are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit [against a private employer].").

### B. Rehabilitation Act Claim – Motion to Dismiss

Defendant urges the Court to dismiss plaintiff's Rehabilitation Act claim for failure to exhaust administrative remedies. He relies on Federal Rule of Civil Procedure 12(b)(1), which concerns subject matter jurisdiction.

Although exhaustion of administrative remedies is a "prerequisite to . . . suit," *Figueroa*,

711 F. Supp. 2d at 569, and is therefore sometimes described in quasi-jurisdictional terms, "failure to exhaust administrative remedies is not a jurisdictional bar for federal employees seeking relief under Title VII" and related statutes barring employment discrimination. *Zografov v. V.A. Medical Center*, 779 F.2d 967 (4th Cir. 1985); *accord Figueroa*, 711 F. Supp. 2d at 570 n.8; *cf. Henderson v. Shinseki*, 562 U.S. ___, No. 09-1036, slip op. at 4-6 (Mar. 1, 2011) (urging "discipline" against applying the "jurisdictional brand" to rules that do not "govern[] a court's adjudicatory capacity," even where such rules are "important and mandatory"). Rather, the failure of a federal employee claiming employment discrimination to exhaust administrative remedies is an "affirmative defense," for which the employer has the burden of proof. *Young v. Nat'l Ctr. for Health Servs. Research*, 828 F.2d 235, 238 (4th Cir. 1987); *accord Belgrave v. Peña*, 254 F.3d 384, 386 (2d Cir. 2001); *cf. Jones v. Bock*, 549 U.S. 199, 212 (2007) ("[T]he usual practice under the Federal Rules is to regard exhaustion as an affirmative defense.").

To resolve this issue, I must consider "matter outside the pleadings." Fed. R. Civ. P. 12(d). Therefore, I must apply the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure. *See, e.g.*, *Jakubiak v. Perry*, 101 F.3d 23, 24 & n.1 (4th Cir. 1996) (reviewing district court's dismissal of federal employee's employment discrimination claim for failure to exhaust administrative remedies under summary judgment standard, where district court considered matter outside the pleadings).[9]

Despite defendant's allegation that plaintiff failed to exhaust administrative remedies, there is no dispute that plaintiff filed a claim and pursued the process specified in 29 C.F.R. part

---

[9] Notably, the applicable standard makes no difference as to this claim, as there is no factual dispute, and defendant's claim fails under either Rule 12(b)(1) or Rule 12(b)(6), in addition to Rule 56.

1614.  Rather, defendant argues that plaintiff "never provided documentation to the EEO investigator to establish the existence of a disability," and "did not provide the name of a doctor in his responses to the EEO investigator."  Mem. Of Law In Support Of Mot. To Dismiss And For Summ. J. ("Mem.") at 13 (ECF 12-1).  Defendant asserts that "the charge accepted for investigation did not identify a particular disability," and faults plaintiff for "never attempt[ing] to argue to the EEO that the charge was incomplete despite being instructed that he could state his disagreement."  *Id.*  According to defendant, plaintiff "refuse[d] to provide information and thereby frustrate[d] administrative review of the merits of [his] claims," and is therefore "subject to a motion to dismiss for failure to exhaust administrative remedies."  *Id.* at 12.

In opposition, plaintiff argues that, as to his Rehabilitation Act claim, he "filed a sufficient charge that was 'precise enough to identify the parties and describes generally the actions or practices complained of,' and the claim does not exceed the scope of the EEOC charge."  Opp. at 23 (quoting *Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 570 (E.D. Va. 2009) (internal quotation marks omitted)).  He contends, Opp. at 23:

> Although Mr. Lerner's documentation of his medical condition may have inadvertently been omitted from his submissions to the EEOC, this was not willful, did not hinder or obstruct the EEOC processing and investigation of his charges and did not prejudice the Defendant with respect to any defense or position regarding the issue.  Indeed, during the EEO investigation, Defendant denied any knowledge of Mr. Lerner's medical condition or disability and responded to a number of affidavit questions about Mr. Lerner's disability charges.

I see no merit in defendant's contention.  Plaintiff's VA Complaint plainly asserted that he "was fired because of . . . [his] medical condition, Chronic Obstructive Pulmonary Disease (COPD)."  VA Complaint at 2.  On September 3, 2009, the VA's Office of Resolution Management wrote to plaintiff's counsel to notify him that plaintiff's claim "meets procedural

requirements and is therefore **ACCEPTED** for investigation and further processing."  Notice of

Acceptance at 1, Ex.3C to Mem. (ECF 12-13) (emphasis in original).  The Notice of Acceptance

phrased plaintiff's complaint as raising the following issue: "Whether on the bases of age (over

40), disability, and religion (Jewish) on June 26, 2009, your client was terminated (during the

probationary period) from his position of Career Intern Contract Specialist, GS-1102-9."  *Id.*

      To be sure, the Notice of Acceptance referred to "disability," without specifically

mentioning COPD.  Although the Notice of Acceptance gave plaintiff the opportunity to notify

the Office of Resolution Management if plaintiff "believe[d] that the accepted claim is

improperly formulated, incomplete, or incorrect," *id.,* it did not indicate that there was any

deficiency in the claim.  To the contrary, it expressly accepted the claim as formulated.

      As indicated, plaintiff's VA Complaint was assigned to EEO Investigator Munsky.  He

wrote to plaintiff's counsel on November 3, 2009, requesting that Lerner submit a written

affidavit responding to a series of questions, along with "any supporting documentation you wish

to be considered as an exhibit in the investigate [sic] file."  Letter of Munsky at 1, Ex.3D to

Mem. (ECF 12-14).  However, Munsky did not specifically request any documentation of

Lerner's medical condition.  But, he attached to his letter an informational pamphlet promulgated

by the Office of Resolution Management, entitled "EEOC Guidelines for What It Takes to Prove

Discrimination[ ] Based on Disability."  *Id.* at 9.  The pamphlet discussed several "factors,"

"some or all" of which the Office would review, "depending on the nature of [the] allegation."

*Id.*  Among these factors was that the complainant "must be a 'Qualified Individual with a

Disability,'" and in the section of the pamphlet discussing that factor, the pamphlet indicated that

the Office "will need verification from your physician(s) as to the nature, extent, and duration of

your disability. This documentation should be presented at the time you contact an EEO Counselor, or as soon thereafter as possible." *Id.* at 10.

Additionally, the affidavit that Munsky provided for Lerner to complete contained a series of questions about Lerner's disability. *See* Lerner Affidavit at 1-3, Ex.3F to Mem. (ECF 12-16). In the completed affidavit, Lerner identified COPD as his disability; identified various medications and assistive devices that he uses; and noted that COPD causes an "[i]nability to sleep normally and inability to breath[e] normally," and the medications cause drowsiness, lethargy, and sleepiness. *Id.* at 2-3. In response to the question, "Do you have medical documents about your impairment/disability? If so, please provide documentation," Lerner responded, "Yes. Not in my possession or control." *Id.* at 2.

Munsky did not respond to Lerner to indicate that Lerner's affidavit was inadequate or to request further documentation of his medical condition. Upon receipt of further affidavits and documentary evidence from various witnesses (including Starinsky and Doyle), Munsky completed his Investigative Report on December 9, 2009. *See* Investigative Report, Ex.21 to Opp. (ECF 17-22). The Investigative Report does not mention the absence of documentation of Lerner's medical condition. Rather, it recounts a factual dispute between Lerner, Starinsky, and Doyle as to whether Lerner had informed Starinsky and Doyle of his disability. According to the Investigative Report, Lerner alleged that he "disclosed his disability to his supervisor, Ms. Starinsky," and that Doyle "became aware of his disability through his disclosure to Ms. Starinsky." *Id.* at 2. Conversely, both Doyle and Starinsky "denied knowledge" of Lerner's disability. *Id.* at 3.

Defendant cites case law for the proposition that a plaintiff who refuses to provide details

underlying his charge of discrimination "prevent[s] the defendant from investigating the charges and consequently fail[s] to exhaust administrative remedies." *Woodard v. Lehman*, 717 F.2d 909, 914 (4th Cir. 1983) (holding that dismissal for failure to exhaust administrative remedies was required where claimants "refused to supply any specific information or details of discriminatory action suffered by them"); *see Austin v. Winter*, 286 F. App'x 31, 36-37 (4th Cir. 2008) (holding that claimant's refusal to participate in a "fact-finding conference" prevented the agency "from fully investigating the complaint and reaching a final decision," and constituted "a failure to exhaust her administrative remedies"); *Johnson v. Bergland*, 614 F.2d 415, 417-18 (5th Cir. 1980) (affirming dismissal for failure to exhaust administrative remedies where agency "requested information concerning specific instances [of discrimination] and their dates to support" plaintiff's claim, plaintiff's reply merely "included general statements of unspecified time," and agency then denied claim on the ground that "plaintiff's allegations 'are so vague and general that specific issues related to discrimination cannot be defined'") (quoting agency).

But, this is not a case in which "a 'complainant's failure to cooperate in the administrative process . . . prevent[ed] the agency from making a determination on the merits.'" *Austin*, 286 F. App'x at 36 (quoting *Jasch v. Potter*, 302 F.3d 1092, 1094 (9th Cir. 2002)). Unlike the cases cited by defendant, there is no indication that Lerner failed to cooperate, or that the lack of medical documentation hampered Munsky's ability to investigate Lerner's claim. Munsky completed his Investigative Report without mention of the lack of medical documentation. Moreover, it was apparently undisputed that Lerner suffered from COPD and that it constituted a disability. Rather, Starinsky and Doyle contended that they had no knowledge of Lerner's condition. Consequently, Lerner's failure to provide the documentation

does not "'preclude[] exhaustion.'" *Austin*, 286 F. App'x at 36 (quoting *Jasch*, 302 F.3d at 1094).

<u>C.  IIED Claim – Motion to Dismiss</u>

Defendant urges dismissal of plaintiff's state law tort claim (IIED) based on two independent grounds.  First, plaintiff did not present the tort claim to the agency before filing suit, and the claim should therefore be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Second, plaintiff's Complaint fails to state a claim of IIED as a matter of law, and therefore should be dismissed under Rule 12(b)(6).  *See* Mem. at 14-16.

In his opposition, plaintiff includes a section heading stating, *inter alia*, that his "IIED Claims Should be Not [sic] Dismissed," Opp. at 21, but otherwise fails to include any argument whatsoever opposing defendant's contentions.  Plaintiff's wholesale failure to include any argument on this point is, in itself, a sufficient basis to dismiss the IIED claim.  *See, e.g.*, *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [defendant's] argument" in a motion to dismiss, "the plaintiff abandons [her] claim."); *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (holding that failure to address defendant's arguments for summary judgment in opposition brief constituted abandonment of claim).

In any event, defendant is correct on the merits.  First, because plaintiff did not submit notice of his tort claim to the agency, this Court lacks jurisdiction over plaintiff's claim.  The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b) & 2671 *et seq.*, permits suits in tort against the United States for "injury or loss of property, or personal injury or death arising

or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." *Id.* § 1346(b)(1). However, before a suit can be filed, a tort claim against the United States must be "presented in writing to the appropriate Federal agency," *id.* § 2401(b), and must be finally denied in writing by the agency (or is deemed denied, if a final disposition is not made within six months after presentation to the agency). *Id.* § 2675(a).

"[T]he requirement of filing an administrative claim is jurisdictional and may not be waived." *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986); *see also Kokotis v. USPS*, 223 F.3d 275, 278 (4th Cir. 2000); *Plyler v. United States*, 900 F.2d 41, 42 (4th Cir. 1990).[10] Because a plaintiff's failure to present a tort claim to the agency in advance of filing suit deprives the court of subject matter jurisdiction, *see Kokotis*, 223 F.3d at 278, a motion to dismiss on that ground is reviewed under Federal Rule of Civil Procedure 12(b)(1), which permits the district court to consider materials outside the pleadings. *See Suter v. United States*, 441 F.3d 306, 309 n.2 (4th Cir.), *cert. denied*, 549 U.S. 887 (2006).

Defendant has submitted an affidavit of Frank D. Giorno, Regional Counsel for the VA, who is the custodian of records for FTCA claims against the United States arising from the conduct of VA employees in Maryland, the District of Columbia, and portions of Virginia and West Virginia. *See* Giorno Aff. ¶ 2, Ex.5 to Mem. (ECF 12-33). According to Giorno, plaintiff has never filed a tort claim with the VA concerning this suit. *Id.* ¶ 3. Plaintiff has not submitted

---

[10] The distinction between the jurisdictional quality of this requirement and the quasi-jurisdictional nature of the requirement for federal employees to exhaust administrative remedies under the Rehabilitation Act and the ADEA can be explained by the fact that the requirement to submit notice of a tort claim is a statutory condition of the United States's waiver of sovereign immunity in the FTCA. *See generally Kokotis*, 223 F.3d at 278.

any evidence to rebut Giorno's assertion. Accordingly, the Court lacks jurisdiction over plaintiff's IIED claim.

Even if the Court had jurisdiction, plaintiff's IIED claim fails as a matter of law. Under the FTCA, tort claims against the United States are governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In this instance, that is the State of Maryland. This Court recently reviewed Maryland's law of intentional infliction of emotional distress in *Respess v. Travelers Cas. & Sur. Co. of Am.*, ___ F. Supp. 2d ___, 2011 WL 904405 (D. Md. Mar. 15, 2011), stating, *id.* at *4 (internal citations and footnotes omitted):

> To recover in Maryland for the tort of intentional infliction of emotional distress, a plaintiff must show that a defendant's conduct was (1) intentional or reckless, (2) extreme and outrageous, (3) causally connected to plaintiff's emotional distress, and (4) that the resulting distress was severe. Moreover, "'[e]ach of these elements must be pled and proved with specificity. It is not enough for a plaintiff merely to allege that they exist; he must set forth facts that, if true, would suffice to demonstrate that they exist.'" Notably, "[f]ailure to allege or prove any one of these elements is fatal[.]"

> The "extreme and outrageous" standard is quite high. The defendant's conduct must be "'so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized [community].'" Indeed, "[t]o be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'"

Assuming, *arguendo*, that plaintiff sufficiently alleged "intentional or reckless" conduct, the actions of plaintiff's superiors as alleged in the Complaint, even if true, do not approach the level of "extreme and outrageous" behavior required to satisfy the second element of the tort. Moreover, the conclusory allegations of plaintiff's Complaint, which merely assert that plaintiff "sufered [sic] sever [sic] mental and emotional distress" as a result of his superiors' conduct, without any factual elaboration, fail to satisfy the third and fourth elements of the tort.

For all of the foregoing reasons, the Court will dismiss Count III of plaintiff's Complaint.

### D.  Summary Judgment

Defendant asserts that he is entitled to summary judgment with respect to plaintiff's ADEA claim and, if not dismissed, his Rehabilitation Act claim.  Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.[11]

Under Rule 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

---

[11] Rule 56 was amended, effective December 1, 2010, after the motion at bar was filed. The amendments "govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending" as of their effective date.  559 U.S. ___, 130 S. Ct. ___, 176 L. Ed. 2d vii (April 28, 2010).  However, the amendments are "not intended to change the summary-judgment standard or burdens."  Rpt. of the Jud. Conf. Cmte. on Rules of Practice & Procedure, at 14 (Sept. 2009).

issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). *See Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) ("Generally, a district court must refuse summary judgment 'where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition.'") (quoting *Liberty Lobby*, 477 U.S. at 250 n. 5). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002) (quoting *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition" without discovery. Fed. R. Civ. P. 56(d). *See generally Harrods*, 302 F.3d at 244-46 (discussing affidavit requirement of former Rule 56(f)).

In this case, no discovery has occurred. However, limited discovery, in the form of submission of affidavits and documentary evidence, took place during the administrative EEO investigation. Moreover, plaintiff has not submitted a Rule 56(d) affidavit, and does not contend that he requires further discovery in order to respond to defendant's motion. Rather, he insists, based in part on the discovery that occurred in the investigation, that "there are material facts that

are in dispute, and the Defendant is not entitle[d] to judgment as a matter of law." Response in Opp. to Mot. to Dismiss and for Summ. J. at 1 (ECF 17). Accordingly, the Court will consider defendant's motion for summary judgment, despite the lack of discovery.

### E. Employment Discrimination – Methods of Proof

In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12] If the employee plaintiff chooses to proceed under the *McDonnell Douglas* approach, the

---

[12] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII of the Civil Rights Act of 1964. However, the burden-shifting methodology it endorsed has been adapted for use in cases of age and disability discrimination. *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003) (applying *McDonnell Douglas* framework to claim of disability discrimination in employment under ADA); *Laber*, *supra*, 438 F.3d at 430 (applying *McDonnell Douglas* framework to federal employee's claim of age discrimination under ADEA); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 266-68 (4th Cir. 2001) (applying *McDonnell Douglas* framework to federal employee's claim of disability discrimination in employment under the Rehabilitation Act). *But see Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2349 n.2 (2009) (observing that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context").

plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).[13]

If the plaintiff establishes a prima facie case, by a preponderance of the evidence, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, ___ F.3d ___, No. 09-2024, 2011 WL 1206658, at *11 (4th Cir. Apr. 1, 2011). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore,

---

[13] In *McDonnell Douglas,* the prima facie case of racial discrimination in hiring was formulated as follows, 411 U.S. at 802:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

"whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

When the defendant meets its burden, the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. *See also Adams v. Trustees of Univ. of North Carolina-Wilmington*, ___ F.3d ___, No. 10-1413, slip op. at 17 (4th Cir. Apr. 6, 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995); emphasis in original).

On the other hand, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," and the plaintiff has proved a prima facie case, "the court must award judgment to the plaintiff as a matter of law," *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3.[14] *See Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation

---

[14] In *St. Mary's Honor Center*, the Supreme Court concluded that, where the employer meets its burden of producing evidence of legitimate reasons for its adverse action, but the fact-finder disbelieves all of the employer's proffered reasons, judgment for the plaintiff is permitted, but not mandatory, in that situation. The Court explained:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and . . . upon such rejection, "[n]o additional proof of discrimination is *required*. . . ." But . . . holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff

- 23 -

of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

The *McDonnell Douglas* scheme was created to resolve "the proper order and nature of proof" of discrimination at trial. *McDonnell Douglas*, 411 U.S. at 793. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (stating that the *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production.") (Emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion . . . never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). The purpose of the prima facie case requirement is to assist the plaintiff in surmounting two common "evidentiary obstacles": (1) that "'direct evidence of discrimination is likely to be unavailable'"; and (2) that "'the employer has the best access to the reasons that prompted him to fire, reject, discipline or refuse to promote'" the employee. *Smith v. Univ. of North Carolina at Chapel Hill*, 632 F.2d 316, 334 (4th Cir. 1980) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("[T]he entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."). Therefore, the plaintiff is not required to present evidence of discriminatory intent in the

disregards the fundamental principle . . . that a presumption does not shift the burden of proof, and ignores our repeated admonition that the . . . plaintiff at all times bears the "ultimate burden of persuasion."

509 U.S. at 511 (internal citations and footnote omitted; emphasis in original)

prima facie case. Nor is the plaintiff required to "exclude every hypothetical reason for the defendant's action toward him." *Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 643 (4th Cir. 1978). Rather, the prima facie case "serves [the] important function" of "eliminat[ing] the most common nondiscriminatory reasons for the plaintiff's rejection," *Burdine*, 450 U.S. at 253-54, which "are (1) 'lack of qualification' or (2) 'elimination of the job.'" *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citation omitted). The rationale of the *McDonnell Douglas* approach is that, if a plaintiff proves a prima facie case, and the defendant submits no evidence of any legitimate basis for its actions, the court or fact finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978).

The relevance of the *McDonnell Douglas* scheme outside of the trial context is limited. "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination" under *McDonnell Douglas* to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007). And, application of the *McDonnell Douglas* test at the summary judgment stage is a thorny issue. The Fourth Circuit has admonished the district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted).

The Court of Appeals for the District of Columbia Circuit has bluntly stated that, in

considering an employer's motion for summary judgment, "the prima facie case is a largely unnecessary sideshow" in the vast majority of cases, and that "judicial inquiry into the prima facie case is usually misplaced." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008). Writing for that court, Judge Kavanaugh explained, *id.* (emphasis in original):

> [B]y the time the district court considers an employer's motion for summary judgment . . . the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision—for example, through a declaration, deposition, or other testimony from the employer's decisionmaker. That's important because once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is "no longer relevant" and thus "disappear[s]" and "drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).
>
> *      *      *
>
> Lest there be any lingering uncertainty, we state the rule clearly: In a [discrimination] suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment . . . in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [a protected classification]?

The Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*,'" and that, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination." *Merritt*, *supra*, 601 F.3d at 294-95 (citation omitted). Moreover, it is a common practice of the Fourth Circuit and of this Court to assume, without deciding, that the plaintiff has established a prima facie case in cases where the employer has proffered evidence of a legitimate reason for its

adverse action in its motion for summary judgment.  *See, e.g.*, *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber*, *supra*, 438 F.3d at 432; *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005); *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009); *Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

Having reviewed the applicable law, I shall proceed to apply it in the context of the parties' particular claims.  Preliminarily, it is plain that, by adducing evidence of plaintiff's deficient job performance in the form of the Termination Letter, the Counseling Letter, and the FMG Assessment, defendant has satisfied the burden of producing evidence from which a jury could conclude that the defendant had a legitimate, non-discriminatory reason to discharge plaintiff.  Therefore, the Court need not decide whether plaintiff could establish a prima facie case of either age or disability discrimination under the *McDonnell Douglas* scheme.  Whether plaintiff were to proceed at trial under the *McDonnell Douglas* framework or under ordinary principles of proof, the Court must determine whether plaintiff has adduced evidence that, if believed, could convince a finder of fact that defendant's purported reasons were pretexts, and that the actual basis for his discharge was unlawful discrimination.

F.  ADEA Claim

As noted, Lerner's claim of age discrimination is governed by the ADEA.  *See* 29 U.S.C. § 633a.  Under that statute, a plaintiff must prove "that age was the 'but-for' cause of the challenged employer decision."  *Gross*, *supra*, 129 S. Ct. at 2351.

Plaintiff's primary evidence in this regard is two alleged statements made to him by his supervisors: first, Doyle's statement, "[e]arly during [his] employment," that "'it was a mistake

to hire'" Lerner; and second, the comment made by either Doyle or Starinsky that Lerner was "too old to change."[15] VA Complaint at 2; *see also* Complaint ¶ 10; Lerner Affidavit at 5.

Lerner also points to affidavits of three of his classmates in the Internship School: Nathaniel Costley, Frank Gonzalez, and Kimberly Carroll. All three affidavits were created during the VA administrative investigation. *See* Affidavit of Nathaniel Costley ("Costley Aff."), Ex.3G to Mem. (ECF 12-17); Affidavit of Frank Gonzalez ("Gonzalez Aff."), Ex.3H to Mem. (ECF 12-18); Affidavit of Kimberly Carroll, Ex.3I to Mem. (ECF 12-19).[16]

---

[15] As noted, in his Complaint filed in this Court and in his affidavit submitted under oath during the VA administrative investigation, Lerner attributed this comment to Doyle. But, in his unsworn VA Complaint, he attributed the comment to Starinsky. Defendant suggests that, faced with this conflict in the evidence, the Court could "decide not to credit the '[too] old to change' testimony," but in any event should only accept "exactly what Lerner has sworn." Reply at 7-8. In considering a motion for summary judgment, "a court is not entitled to either weigh the evidence or make credibility determinations," and therefore, when faced with an inconsistency in the non-moving party's evidence, a court must ordinarily "assess whether a reasonable trier of fact, viewing the evidence in the light most favorable to [the non-moving party], would be entitled to conclude that [the party's] inconsistent statements were made innocently." *In re French*, 499 F.3d 345, 351-52 (4th Cir. 2007). However, even if the Court were permitted to resolve the inconsistency in Lerner's allegations at this stage, it is not necessary to do so, because (as discussed, *infra*) neither version of events will suffice to avoid summary judgment.

[16] Notably, Costley, Gonzalez, and Carroll were all terminated from the Internship School contemporaneously with Lerner. Gonzalez was terminated on June 1, 2009, and Costley and Carroll were both terminated on June 12, 2009, the same day as Lerner. *See* Costley Aff. ¶ 1; Gonzalez Aff. ¶ 10; Carroll Aff. ¶ 10. Costley and Carroll both filed suit in this Court, alleging employment discrimination on the basis of race and retaliatory firing; additionally, Costley raised a claim of disability discrimination, and Carroll asserted a claim of IIED. *See Costley v. Shinseki*, Civ. No. JKB-10-3122 (D. Md.); *Carroll v. Shinseki*, Civ. No. BEL-10-1108 (D. Md.). Costley is proceeding *pro se*, while Carroll is represented by the same counsel who represents Lerner. Judge Bredar dismissed Costley's claims of discrimination and granted summary judgment against Costley with respect to his claim of retaliation, thus terminating his case. *See Costley v. Shinseki*, Civ. No. JKB-10-3122, ECF 33 & 34 (D. Md. May 6, 2011). Costley noted an appeal. *See id.*, ECF 36. Judge Legg dismissed three counts of Carroll's complaint, and her case is now in discovery as to a single count of alleged racial discrimination. *See Carroll v. Shinseki*, Civ. No. BEL-10-1108, ECF 17 & 18 (D. Md. Mar. 31. 2011).

According to Costley, "both Lisa Doyle and Melissa Starinsky made open comments concerning Mr. Lerner's age and how he was not a good fit for the program because of his age." Costley Aff. ¶ 13. However, Costley did not specify the dates of these comments, or provide further context for them. Costley also averred that, during Lerner's "Mission Service Project Presentation," other classmates "mocked and laughed at Mr. Lerner," including making comments "that the old man had fallen in love." *Id.* ¶ 11. Costley claimed that Starinsky was present during this event (the date of which he did not specify), and that Starinsky "did nothing and made no comments." *Id.*

Gonzalez recounted that "Stanley [Lerner] was regularly ridiculed for his age," and that "[m]any interns would 'sinker' [sic] at him when Stanley would ask questions in class." Gonzalez Aff. ¶ 11. He also averred: "Few of the interns wanted to work with Stanley. They rarely considered any of his suggestions." *Id.* at 13. According to Gonzalez, "Lisa Doyle would often avoid calling on Stan when he had a question and when she would finally call on him she was visibly annoyed. Her tone would often be condescending and belittling." *Id.* at 11. "If the other interns were complaining about" Lerner, Gonzalez "believe[d] Lisa Doyle would have gladly used it to fire him." *Id.* ¶ 13.

Carroll recalled in her affidavit that she "observed laughing and jeering at Stanley Lerner's expense on several occasions during class sessions in which the supervisors and teachers were both present." Carroll Aff. ¶ 11. In response to the question whether Carroll believed Lerner was "discriminated against because of his age,"[17] Carroll answered affirmatively, stating: "I witnessed negative attitudes in which supervisors displayed their

---

[17] The affidavits produced during the administrative investigation were in a question-and-answer format.

prejudice toward Stanley Lerner on several occasions." *Id.* ¶ 13.  However, Carroll did not provide dates, names, or any other factual details concerning these "occasions."

Additionally, Lerner submitted two documents authored by Efrain J. Fernandez.  *See* Complaint Against Lisa Doyle, dated July 9, 2009 ("Fernandez Complaint"), Ex.18 to Opp. (ECF 17-19); Memorandum for the Record, dated August 25, 2009 ("Fernandez Memo"), Ex.19 to Opp. (ECF 17-20).[18]  According to these documents, Fernandez was the Executive Director of the VA's Center for Acquisition Innovation, another subdivision of the VA that is housed in the same building as the Acquisition Academy.  *See* Fernandez Complaint at 1.  In the documents, Fernandez indicates that he and Doyle are "co-workers," and both report to the VA's Deputy Assistant Secretary of Acquisition and Logistics.  *Id.*

The Fernandez Complaint and Fernandez Memo catalog a series of unprofessional behaviors that Fernandez alleges were exhibited by Doyle, which were directed primarily at Fernandez and his staff, and which Fernandez contends amounted to a "hostile work environment."  *Id.* at 2-4.  None of Fernandez's allegations relate directly to Lerner, however.  Indeed, Lerner is not mentioned in either document, and only one allegation in the Fernandez documents has even arguable relevance to this case.

The allegation at issue in the Fernandez documents concerns another VA employee, Sandra Park.[19]  Fernandez states, Fernandez Memo at 1-2 (emphasis in original):

---

[18]  Defendant argues that the "Fernandez documents are unsworn and must be disregarded" for purposes of summary judgment.  Reply at 16.  However, the Fernandez Memo is signed by Fernandez and is captioned "Supplement to Sworn Testimony Given on August 25, 2009 by Efrain J. Fernandez" (although it does not contain an oath or affirmation).  Fernandez Memo at 1.

[19]  The allegations regarding Park are contained in the Fernandez Complaint and the Fernandez Memo.

Sometime in January 2009 (actual date unknown), Ms. Doyle told me that she had telephonically interviewed and selected Ms. Sandra Park for the Assistant Vice Chancellor of the VA Acquisition Academy School of FAC-C Training and Certification. . . . Ms. Doyle was very excited about the selection and told me that she had finally found the "right person for the job." She mentioned to me that Ms. Park was very credentialed, interviewed exceptionally well and had even taught classes at the Defense Acquisition University (DAU)—a very prestigious position for anyone in our field. She also told me that [s]he could not wait for Ms. Park [to] report[] to work.

A few weeks later (actual date unknown) Ms. Park reported to work. Within hours of her reporting for duty, Ms. Doyle came to my office very upset and almost in tears and told me that she had made a very bad mistake. She said that she had just met Ms. Park and that she looked like an "old cleaning lady." She said that she had to "get rid" of her because she did not "look the part" and could not officially represent her (Ms. Doyle), VA or the Academy.

The Fernandez Memo then details a series of attempts by Doyle to "get rid of" Park, and her efforts to enlist Fernandez in these attempts. *See id.* at 2-3.

The Fourth Circuit has instructed that direct evidence of discriminatory intent "must be 'evidence of conduct or statements that *both* reflect directly the alleged discriminatory attitude *and* that bear *directly* on the contested employment decision.' Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)) (emphasis added; internal citation omitted). *See also Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.") (internal quotation marks and alteration omitted), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Defendant contends that plaintiff's evidence cannot meet this standard, and I agree.

Most of Doyle's alleged conduct in connection with Lerner simply has no reference to age. Doyle's alleged comment that it was a "mistake" to hire Lerner, her "visibl[e] annoy[ance]" at his class participation, and her "condescending and belittling tone," do not necessarily constitute age-based animus. They could be explained by any number of reasons, not the least of which is Lerner's poor academic and professional performance, as documented in the FMG Assessment. Even if the allegations were credited as true (and even if they were presented with any degree of factual specificity, which the conclusory affidavits submitted by Lerner and his co-workers lack), no rational fact finder could conclude that Doyle's conduct established discriminatory intent to terminate Lerner on the basis of his age.

Moreover, the silence of Lerner's supervisors and instructors in the face of his fellow interns' alleged inappropriate comments regarding his age cannot, without more, support Lerner's ADEA claim. As the Fourth Circuit recently remarked in *Merritt*, *supra*, 601 F.3d at 300: "It is regrettable that any distasteful comments will arise in the workplace, but that cannot mean that the actual decision maker is impugned thereby." Rather, the plaintiff must put forth evidence that shows a "nexus" between a "'discriminatory attitude at the workplace'" and the "'employment action.'" *Lettieri v. Equant, Inc.*, 478 F.3d 640, 649 (4th Cir. 2007) (citations omitted).

*Merritt* is instructive. In that case, the plaintiff was fired from her job as a truck driver for a freight transport company. At the company, "the corporate culture evinced a very specific yet pervasive aversion to the idea of female Pickup and Delivery drivers," and plaintiff's co-workers, "of all ranks, seemed to share a view that women were unfit for that position." *Merritt*, 601 F.3d at 300-01. Notably, the *Merritt* Court cautioned against "attributing to any ultimate

decision maker . . . the most unfortunate expressions and beliefs of those around him and those who worked in his employ." *Id.* at 300.

However, the Court reasoned that a jury could find a nexus between the discriminatory attitude that pervaded the plaintiff's workplace and her supervisor's decision to require her to take a physical ability test ("PAT") after returning to work from an injury. The plaintiff adduced evidence that the employer did not routinely require similarly situated male employees to take the PAT, yet the plaintiff's failure of the PAT was the ostensible reason for her termination. The Court concluded that "at some point the corporate environment in which he worked places [Merritt's supervisor's] own selective use of the PAT in Merritt's case in a less neutral context." *Id.* at 301.

Here, unlike *Merritt*, plaintiff points to no employment criterion that was applied to him but was not applied to similarly situated, younger employees. Indeed, it is noteworthy that plaintiff's three co-workers who submitted affidavits on his behalf were also fired contemporaneously with Lerner, and all three are significantly younger than Lerner: Costley was born in 1978; Gonzalez was born in 1968; and Carroll was born in 1969. *See* Costley Aff. ¶ 6; Gonzalez Aff. ¶ 6; Carroll Aff. ¶ 6. Notably absent from plaintiff's evidence is any indication of a connection between his fellow interns' attitudes and the ultimate decision to terminate him.

The closest plaintiff comes to actual evidence of age-based animus is the single, ambiguous comment by either Doyle or Starinsky that he was "too old to change." Several cases have rejected similar fleeting expressions of age-related concerns as evidence of discrimination. "[G]eneral or ambiguous remarks referring to the process of generational change create no triable issue of age discrimination." *Mereish v. Walker*, 359 F.3d 330, 336-37 (4th Cir. 2004).

Whether it was Doyle or Starinsky who made the comment that Lerner was "too old to change," such a single, isolated comment, which was not directly connected to the decision to fire Lerner, cannot avert summary judgment.

In *Mereish*, the Court held that stray comments by the plaintiff's supervisor expressing "concern about the aging workforce" at the employing agency, the " 'tunnel vision' and lack of flexibility characteristic of some scientists," and the "'problem' of the 'average age going higher'" did not suffice as evidence of discriminatory animus. *Id.* at 336. Similarly, in *Warch*, *supra*, 435 F.3d at 520, a supervisor's comment that "a job candidate who happened to be similar in age and experience to Warch would have a hard time getting a job because 'hiring people at that age, they didn't get the work out of them that they did younger people,'" could not avert summary judgment against the plaintiff where plaintiff presented "no evidence showing that this comment was more than an isolated event or that it had any nexus with the decision to terminate him." *See also Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (holding that the statement that "there comes a time when we have to make way for younger people" simply reflects "a fact of life" and could not create any "inference of age bias"); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942-43 (4th Cir. 1992) (holding that references to the need to "attract newer, younger people" or "young blood" were insufficient evidence of age bias); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (holding that a reference to needing "some new young blood" was not probative of age bias); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (same).

Perhaps more important, given that ADEA liability only accrues if age is a "but for" cause of the decision to terminate, *see Gross*, *supra*, 129 S. Ct. at 2351, Lerner has advanced

absolutely no evidence from which a fact finder could conclude that Doyle and Starinsky's stated concerns regarding his performance were unfounded or pretextual. Lerner's attempt to undermine the legitimacy of the Counseling Letter and the FMG Assessment as bases for his termination misses the mark.

As to the Counseling Letter, Lerner questions its timing, noting that Starinsky gave it to him one week after she received the Letter of Warning from the Security and Investigations Center. *See* Opp. at 17-18. As defendant aptly comments: "This is a non-sensical argument. It would be entirely prudent for a manager to document all outstanding conduct and performance issues when informed that an employee who is an intern for a position of financial trust has been convicted of 'Financial Institution Fraud.'" Reply at 11. Moreover, the primary stated basis for Starinsky's Counseling Letter was alleged "angry, aggressive. and annoying comments" that Lerner had allegedly directed at an instructor only a week earlier. Counseling Letter at 1. This tends to negate any argument that the letter was a pretext based on its timing.

But, even accepting Lerner's premise that the concerns in Starinsky's Counseling Letter were fabrications and that the true motivation for the letter was Starinsky's discovery of the issues indicated in the Letter of Warning, this would do nothing to advance Lerner's ADEA claim. Rather, it would establish, at most, that Lerner's prior criminal convictions and present credit issues, not his age, were the reasons for his termination.

Lerner also cites an internal VA handbook, Ex.15 to Opp. (ECF 17-16), in an attempt to establish that the FMG Assessment was not recognized by the VA as an "assessment tool" for "performance appraisal," and thus Doyle and Starinsky could not legitimately have relied upon it as a basis for his termination. Even assuming that Lerner is correct that internal VA procedures

did not permit reliance on the FMG Assessment as a basis for a personnel decision, that does not establish that Doyle's reliance on it was pretextual, or that Lerner's age was the true reason for his termination.

Notably, Lerner does not contend that the FMG Assessment was used arbitrarily to assess only his performance, but was not considered in personnel decisions concerning other interns.[20] Even assuming that the FMG Assessment was not a legitimate criterion for personnel decision making, Doyle's use of the FMG Assessment would, at most, give rise to a claim that Lerner's termination was procedurally improper. This does not equate to a claim of age discrimination under the ADEA.

Moreover, Lerner's reliance on the unauthenticated documents from Fernandez does not bolster his case. Even if the documents can be considered at summary judgment without further authentication, they are not probative of Doyle's decision making with respect to Lerner. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004) (rejecting plaintiff's evidence regarding the "treatment of other Booz-Allen employees," because "'an individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance,'" and testimony regarding the terminations of other employees would be "irrelevant and prejudicial") (quoting *Lowery v. Circuit City Stores, Inc.*,

---

[20] Indeed, such a claim would be undercut by the record in the cases filed in this Court by Lerner's co-workers, Carroll and Costley, whose "unacceptable" ratings in FMG Assessments also formed part of the putative basis for their terminations. *See Carroll v. Shinseki*, Civ. No. BEL-10-1108, ECF 8-26 & 8-32 (D. Md. Sept. 3, 2010) (termination letter and FMG Assessment submitted as exhibits to defendant's motion for summary judgment); *Costley v. Shinseki*, Civ. No. JKB-10-3122, ECF 25-11 & 25-13 (D. Md. Mar. 7, 2011) (same). *See also Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records").

158 F.3d 742, 761 (4th Cir. 1998); citing, *inter alia*, *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 156 (6th Cir. 1988)).

In sum, Lerner has not presented evidence from which a rational trier of fact could conclude that he was the victim of intentional discrimination on the basis of age. Accordingly, summary judgment will be granted to the defendant as to Count I of Lerner's Complaint.

### G. Rehabilitation Act Claim

Plaintiff also claims that the defendant terminated him on the basis of disability, in violation of § 501 of the Rehabilitation Act. *See* 29 U.S.C. § 791. In this circuit, to establish a violation of the Rehabilitation Act, a federal employee must prove: "(1) that he has a disability; (2) that he is otherwise qualified for the employment . . . in question; and (3) that he was excluded from the employment . . . due to discrimination . . . on the basis of the disability." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995).[21]

---

[21] In *Doe*, the Court stated that the plaintiff must prove discrimination based "solely" on disability. However, the Fourth Circuit later concluded in *Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999), that *Doe's* use of the "solely" standard was dictum, and held that, unlike § 504 of the Rehabilitation Act, "the ADA does not impose a 'solely by reason of' standard of causation." *Id.* at 469 (contrasting the ADA, which prohibits discrimination "on the basis of disability," with 29 U.S.C. § 794(a), which prohibits discrimination "solely by reason of . . . disability").

As Judge Motz recently noted in *Figueroa*, *supra*, 711 F. Supp. 2d at 569 n.7, there is some disagreement among federal courts as to whether employment discrimination suits by federal employees should be brought under § 501 or § 504 of the Rehabilitation Act (*i.e.*, 29 U.S.C. § 791 or § 794). Despite dicta to the contrary in an unreported Fourth Circuit opinion, *see Webster v. Henderson*, 32 F. App'x 36, 41 (4th Cir. 2002), Judge Motz concluded that such claims are more properly brought under § 501, which expressly refers to federal agencies and employment discrimination actions, as opposed to § 504, which is limited to federally funded programs or activities of state, local, and private entities. In this case, plaintiff has expressly staked his claim on § 501 of the Rehabilitation Act (as did the plaintiff in *Figueroa*). *See* Complaint ¶ 1.

Unlike § 504, § 501 of the Rehabilitation Act does not contain an express prohibition on

Defendant contends that plaintiff falters at the first step, because he "has presented no evidence, other than bald assertion, that he suffers from Chronic Obstructive Pulmonary Disorder." Mem. at 22. Citing Lerner's affidavit, his Complaint in this Court, and his VA Complaint, defendant argues, *id.* (citations omitted):

> [Lerner] has no idea when his purported disability developed, what caused it, or how long it is expected to last. He did not tell this Court nor did he tell the EEO investigator basic information such as who his treating physician was or when the diagnosis of COPD was made. And, although he testified that medical records exist documenting his alleged disability, he failed to provide them.

In response, Lerner has submitted a letter dated June 17, 2009, from Dr. Bonnie Fitleberg, M.D., asserting that Lerner has COPD and was treated by Dr. Fitleberg on May 13, 2009, for "follow up treatment of an acute exacerbation." Ex.14 to Opp. (ECF 17-15). Along with Dr. Fitleberg's letter, Lerner has submitted a "visit summary" from a visit to Dr. Fitleberg on April 23, 2009. The visit summary does not expressly mention COPD, however. *Id.*

In his reply, defendant notes that Lerner has not "argued or submitted evidence that he provided to Ms. Doyle or Ms. Starinsky the medical records he has submitted to this Court." Reply at 17.

As noted, the affidavits of Lerner, Starinsky, and Doyle that were submitted during the EEO investigation establish a dispute of fact as to whether Lerner informed Starinsky and Doyle about his medical condition. Lerner contends that he informed his supervisors of his COPD in

---

discrimination. Rather, it provides: "The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act," and the remedial provisions of the ADA "as such sections relate to employment." 29 U.S.C. § 791(g). Thus, it would appear that the liability standard of the ADA, to which the "solely" limitation does not apply, governs federal employees' disability discrimination claims.

In any event, the resolution of plaintiff's Rehabilitation Act claim in this case does not turn on which causation standard is applied.

May 2009, while both Doyle and Starinsky deny ever being aware of his condition. Although Lerner's documentation of his medical condition is scant, I shall assume, *arguendo*, that he informed Starinsky and Doyle of his condition, and that he in fact has a disability, satisfying the first element of a Rehabilitation Act claim. Nonetheless, his claim founders on the second element: whether he was "otherwise qualified for the employment."

To prevail on an employment discrimination claim under § 501 of the Rehabilitation Act (or Title I of the ADA), a plaintiff must be a "qualified individual." *See Doe*, 50 F.3d at 1265. The term "qualified individual" is statutorily defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Viewing the evidence in the light most favorable to Lerner, his employment was terminated due, in part, to his apparent sleeping in class, which was either a direct symptom of his COPD or a side effect of the medication he took for it. But, Lerner cannot establish that he was capable of performing the essential functions of his employment position, and therefore cannot demonstrate that he is a "qualified individual." As already discussed, *supra*, Lerner has advanced no evidence to rebut defendant's evidence of the many other ways (aside from sleeping in class) in which Lerner failed to satisfy the expectations of the program, nor can he establish that those deficiencies are pretexts for invidious discrimination based on his medical condition. The Rehabilitation Act does not prohibit the discharge of an employee who happens to have a disability where the employee "was fired because of his misconduct, not because of his" disability. *Little v. FBI*, 1 F.3d 255, 259 (4th Cir. 1993).

Moreover, to the extent that Lerner's failure to satisfy his employer's performance standards was caused by his disability, he has presented no evidence of any reasonable accommodation that would have permitted him to perform the relevant functions of his position (*i.e.*, stay awake in class), nor has he advanced any evidence that he requested a reasonable accommodation from the VA. *See, e.g.*, *Faiola v. APCO Graphics, Inc.*, 629 F.3d 43, 47 (1st Cir. 2010) ("To make out a reasonable accommodation claim, a plaintiff must establish . . . that the employer knew of her disability but did not reasonably accommodate it upon a request."); *Hennagir v. Utah Dept. of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009) ("At the summary judgment stage, 'the relevant inquiry in determining whether Plaintiff is "qualified" is whether [s]he has provided evidence that [s]he can be reasonably accommodated. . . .'") (citation omitted); *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008) ("[T]he employee must prove that the request was sufficiently direct and specific so as to put the employer on notice of the need for an accommodation.").

Thus, Lerner has not presented evidence from which a reasonable fact finder could conclude that he was terminated in violation of the Rehabilitation Act. Accordingly, summary judgment as to Count II will be entered in favor of defendant.

### H. Conclusion

For the foregoing reasons, summary judgment will be granted in defendant's favor as to Counts I and II of plaintiff's Complaint, Count III of the Complaint will be dismissed, and this case will be closed. An Order implementing this ruling follows.

Dated: June 10, 2011            _____/s/_____

                                     Ellen Lipton Hollander
                                     United States District Judge